*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 13a0027p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

————————————

U.S. CITIZENS ASSOCIATION; JAMES GRAPEK;
MAURICE A. THOMPSON,

　　　　　　　　　*Plaintiffs-Appellants*,

EILEEN DANNEMANN,

　　　　　　　　　*Plaintiff*,

　　　*v.*

KATHLEEN SEBELIUS, in her official capacity
as the Secretary of the U.S. Department of
Health and Human Services; TIMOTHY F.
GEITHNER, in his official capacity as the
Secretary of the U.S. Department of the
Treasury; ERIC H. HOLDER, JR., in his official
capacity as the Attorney General of the
United States; UNITED STATES OF AMERICA,

　　　　　　　　　*Defendants-Appellees*.

Nos. 11-3327/3798

Appeal from the United States District Court
for the Northern District of Ohio at Akron.
No. 5:10-cv-1065—David D. Dowd, Jr., District Judge.

Decided and Filed: February 1, 2013

Before: SUHRHEINRICH, STRANCH, and DONALD, Circuit Judges.

————————————

## COUNSEL

**ON BRIEF:** Jonathan W. Emord, EMORD & ASSOCIATES, P.C., Clifton, Virginia,
William G. Williams, KRUGLIAK, WILKINS, GRIFFITHS & DOUGHERTY CO.,
LPA, Canton, Ohio, for Appellants. Mark B. Stern, Alisa B. Klein, Dana Kaersvang,
UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellees.

1

————————————————

**OPINION**

————————————————

JANE B. STRANCH, Circuit Judge.  In this opinion we return to constitutional challenges to the individual mandate provision of the Patient Protection and Affordable Care Act.[1]  U.S. Citizens Association and two of its members, Maurice A. Thompson, and James Grapek ("plaintiffs"),[2] challenge the constitutionality of the individual mandate, which requires each individual to purchase a health insurance policy providing a minimum level of coverage or make a shared responsibility payment.  26 U.S.C. § 5000A (2010).  The district court dismissed plaintiffs' constitutional challenges to the individual mandate, and we AFFIRM.

## I.  BACKGROUND AND PROCEDURAL HISTORY

U.S. Citizens Association ("USCA") is a non-profit national civic league based in Akron, Ohio, with approximately 27,000 members.  Nearly three hundred of USCA's members reside in the Northern District of Ohio.  USCA notes that it devotes itself to the preservation of conservative values; favors freedom of choice in medical care and the health insurance marketplace; and opposes efforts of the federal government to interfere with market processes.  Some of USCA's uninsured members object to the purchase of private health insurance because they do not believe in the effectiveness of traditional medicine, they prefer alternative and integrative medicine, or they prefer to focus on preventative care that is not covered by traditional health insurance policies.

Thompson is a citizen of Ohio and Grapek is a citizen of Maryland.  They do not have, nor do they wish to acquire, health insurance, but they are not exempt from PPACA's individual mandate.  Thompson claims that he has sufficient income to pay for required emergency medical care if necessary, and but for PPACA, he would not

———————————————————————————

[1]Pub. L. No. 111-148, 124 Stat. 119 (2010), as amended by the Health Care and Education Reconciliation Act, Pub. L. No. 111-152, 124 Stat. 1029 (2010) (collectively "PPACA").

[2]Another plaintiff, Eileen Dannemann, voluntarily dismissed her claims.

purchase health insurance in 2014. He has started contacting insurance companies to consider his options to comply with the individual mandate. Grapek claims that he cannot afford health insurance and must begin saving thousands of dollars now to pay health insurance premiums beginning in 2014.

Plaintiffs filed suit in Ohio for declaratory and injunctive relief against Kathleen Sebelius, Secretary of the United States Department of Health and Human Services; Timothy F. Geithner, Secretary of the United States Department of the Treasury; Eric H. Holder, Jr., Attorney General of the United States; and the United States. Plaintiffs' Second Amended Complaint alleged in count one that the individual mandate violates the Commerce Clause, U.S. Const. art. I, § 8; in count two that it violates plaintiffs' freedom of expressive and intimate association, U.S. Const. amend. I, V; in count three that it violates plaintiffs' right to liberty, U.S. Const. amend. V; and in count four that it violates plaintiffs' right to privacy, U.S. Const. amend. I, III, IV, V, IX. Defendants moved to dismiss all four counts under Federal Rule of Civil Procedure 12(b)(6).

The district court granted the motion to dismiss in part and denied it in part. The court declined to dismiss the suit on the doctrines of standing or ripeness, or on the ground that the suit is barred by the Anti-Injunction Act. The court also declined to dismiss the Commerce Clause challenge, but the court dismissed Counts Two through Four holding, without substantive analysis, that plaintiffs' pleading failed to satisfy the plausibility standard of *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007). The parties then filed motions for summary judgment on the Commerce Clause challenge.

While the summary judgment motions were pending, the district court *sua sponte* entered a partial judgment under Federal Rule of Civil Procedure 54(b) on Counts Two through Four and subsequently denied plaintiffs' motion for clarification or in the alternative, for reconsideration of that decision. Plaintiffs filed a timely notice of appeal from the Rule 54(b) partial judgment.

The district court thereafter stayed its ruling on the Commerce Clause issue. After this court decided that the individual mandate of the PPACA does not violate the

Commerce Clause, *Thomas More Law Ctr. v. Obama*, 651 F.3d 529 (6th Cir. 2011), *abrogated by Nat'l Fed'n of Indep. Bus. v. Sebelius*, 132 S. Ct. 2566 (2012), the district court granted summary judgment in favor of defendants on the Commerce Clause issue (Count One).  Plaintiffs filed a notice of appeal from the final judgment, and this court consolidated the two appeals for resolution.

## II.  APPELLATE JURISDICTION

We have jurisdiction to review final orders and judgments of the district courts. 28 U.S.C. § 1291.  Ordinarily, when a district court dismisses some claims but not others, the district court's decision is not final for purposes of appeal.  In limited circumstances, however, the district court may certify some claims for immediate appeal under Rule 54(b), which provides in pertinent part:

> When an action presents more than one claim for relief—whether as a claim, counterclaim, crossclaim, or third-party claim—. . . the court may direct entry of a final judgment as to one or more, but fewer than all, claims . . . only if the court expressly determines that there is no just reason for delay.

Proper certification under Rule 54(b) requires two steps: "the district court must expressly direct the entry of final judgment as to one or more but fewer than" all of the claims in the case and then the court must expressly find that there is no just reason to delay an appeal. *Gen. Acquisition, Inc. v. GenCorp., Inc.*, 23 F.3d 1022, 1027 (6th Cir. 1994).  If Rule 54(b) certification is not properly entered, a final order does not exist from which an appeal can be taken, and we lack jurisdiction. *Lowery v. Fed. Express Corp.*, 426 F.3d 817, 820 (6th Cir. 2005).

We review *de novo* the district court's determination that multiple claims exist and that one or more of them have been finally determined and may be severed from the remaining claims for the purpose of immediate appeal. *Gen. Acquisition, Inc.*, 23 F.3d at 1027.  We review for an abuse of discretion the district court's finding that no just reason exists to delay an appeal. *Id.*

**A.  Multiple claims**

We recently discussed the application of Rule 54(b) in the context of constitutional claims.  *Planned Parenthood Sw. Ohio Region v. DeWine*, 696 F.3d 490 (6th Cir.  2012).  Concerned with various constitutional challenges to an Ohio abortion statute, we recognized that we had not previously addressed the application of Rule 54(b) to multiple constitutional claims regarding the same statute.  *Id.* at 501.  We observed that the Fifth and Tenth Circuits had applied different tests in considering Rule 54(b) partial judgments in the context of constitutional claims.  *Id.* (citing *Jordan v. Pugh*, 425 F.3d 820, 827 (10th Cir. 2005); *Samaad v. City of Dallas*, 940 F.2d 925, 930–32 (5th Cir. 1992), *abrogated on other grounds as recognized by Rosedale Missionary Baptist Church v. New Orleans City*, 641 F.3d 86, 88–89 (5th Cir. 2011)).  While finding cases from the other circuits to be informative, we "decline[d] to adopt a new test for analyzing multiple facial challenges to the same statute."  *Id.*  Importantly, we stated:

> Statutory challenges will certainly all contain at least one common operative fact—the passage of the challenged law.  But the *aggregate* of operative facts will not necessarily include just the challenged law's existence; rather, we must also consider the facts relating to the law's impact on similar or distinct constitutional rights.

*Id.* at 501.  We distinguished our prior opinion in *Lowery* on the ground that there the party brought only one claim under Rule 54(b) by raising "both a Title VII retaliation claim and a state-law breach-of-contract claim, where the basis for the alleged breach and the Title VII claim was the same retaliatory act by the employer."  *Id.* (citing *Lowery*, 426 F.3d at 821).  By contrast, we reasoned, a "single law that causes distinct injuries to distinct constitutional rights is not so easily analogized to a single retaliatory employment action causing one injury that can be vindicated through multiple channels of relief."  *Id.* at 501–02 (footnote omitted).  All four "potential claims" before us in *Planned Parenthood* sought to disqualify the statute in question as unconstitutional and all four claims "admittedly [sought] the same declaratory and injunctive relief."  *Id.* at 502.  But we ultimately determined that the "aggregate of operative facts" giving rise to

each constitutional right to be vindicated was "sufficiently separate to confer jurisdiction despite the presence of some overlap." *Id.*

Review of the counts alleged in *Planned Parenthood* reveals how the facts attendant to each right were found to be sufficiently distinct. The first count alleged that the statute criminalizing distribution of an abortion drug was unconstitutionally vague and impacted the right of physicians to receive notice of what behavior is criminal before they can be prosecuted. *Id.* The second count, which alleged that the statute violates a woman's right to bodily integrity in obtaining an abortion, bore "no relation to whether the Act gives physicians constitutional notice of criminal conduct." *Id.* We further decided that counts three and four were the most similar because they alleged "violations of the right not to have an undue burden imposed on the abortion decision," but while we would employ the same legal framework to decide both claims, we noted that the injuries and the constitutional rights vindicated were distinct from counts one and two. *Id.* "After reviewing the operative facts necessary to give rise to relief in each claim," we held "that their differences sufficiently outweigh what they have in common. Because each count involves distinct facts relating to separate injuries, each count is a separate claim for purposes of Rule 54(b)." *Id.* Further agreeing with the district court that there was no just cause for delay, we held that we had appellate jurisdiction to proceed to the merits. *Id.* at 502–03.

Application of *Planned Parenthood* to this case begins with recognition that the passage of the individual mandate as part of the PPACA is simply one of the common operative facts before us. We must "consider the facts relating to the law's impact on similar or distinct constitutional rights" and ask whether the alleged injuries and the constitutional rights asserted in each count are distinct from the other counts such that declaratory and injunctive relief might be imposed on separate counts to vindicate separate rights. *Id.* at 501. Doing so leads us to conclude that each count of plaintiffs' Second Amended Complaint alleges an injury to a constitutional right that is distinct from the other counts.

Plaintiffs assert that the individual mandate violates their freedom of expressive and intimate association (Count Two), their right to liberty (Count Three), and their right to privacy in medical information (Count Four). While certain facts alleged support each of these three claims, plaintiffs alleged other facts that are specifically targeted to the rights of expressive and intimate association, the right to liberty, and the right to privacy in medical information. The grant of declaratory or injunctive relief on one of these counts would not vindicate the constitutional right asserted in the other counts. Therefore, under *Planned Parenthood*, Counts Two through Four allege separate constitutional claims, not merely separate legal theories aimed at one declaration of unconstitutionality. We agree with the district court that multiple claims were presented and hold that they provide a sufficient basis for the Rule 54(b) partial judgment.

**B.  No just reason for delay**

The next consideration is whether the district court correctly determined that there was "no just reason for delay" in permitting immediate appeal on Counts Two through Four. The court was required to consider a nonexhaustive list of factors, such as: (1) the relationship between the adjudicated and non-adjudicated claims; (2) the possibility that the need for appellate review might become moot due to future developments in the district court; (3) the possibility that the appellate court might be required to hear the same issue twice; (4) the presence or absence of a claim or counterclaim that might result in a set-off against the final judgment; and (5) other miscellaneous factors, including "delay, economic and solvency considerations, shortening the time of trial, frivolity of competing claims, expense, and the like." *Corrosioneering, Inc. v. Thyssen Envtl. Sys., Inc.*, 807 F.2d 1279, 1283 (6th Cir. 1986).

The district court listed four of these five factors in its Rule 54(b) judgment, recognizing that Rule 54(b) "is intended 'to strike a balance between the undesireability of more than one appeal in a single action and the need for making review available in multiple-party or multiple-claim situations at a time that best serves the needs of the litigants.'" *Good v. Ohio Edison*, 104 F.3d 93, 95 (6th Cir. 1997) (quoting *Day v. NLO, Inc.*, 3 F.3d 153, 155 (6th Cir. 1993)). The court observed that the constitutional claims

in the four counts were "entirely separate" and that the court's decision on three of those four counts was final for purposes of appeal. Accordingly, we conclude that the district court sufficiently considered the first factor—the relationship between the adjudicated and non-adjudicated claims—and the second factor—the possibility that the need for appellate review might become moot by future developments in the district court. The court also found that the nature of the constitutional challenges in Counts Two through Four were independent from the Commerce Clause challenge remaining in Count One, making it unlikely that the appellate court would be required to consider the same issue twice. We are thus satisfied that the court considered the third factor.

The district court did not evaluate the fourth factor—the presence or absence of a claim or counterclaim that might result in a set-off against the final judgment. Because this factor has no application in the case, the court did not abuse its discretion in not discussing this factor.

Finally, the court considered miscellaneous factors to determine that an immediate appeal on three of the four counts was preferable to waiting for entry of final judgment on all counts. At the time the court ruled, it did not know when the appellate courts would decide the primary Commerce Clause challenge to the individual mandate. Having dismissed three of the four claims, the court believed that plaintiffs were entitled to an immediate appeal on the dismissal of those claims. After "balancing all the factors to be considered in this case and the larger context of litigation surrounding the Act," the court found that there was no just reason to delay entry of final judgment on three counts.

The district court's reasoned analysis of the factors, although thin, offered more than a simple recitation of the Rule 54(b) formula; therefore, the court's decision is entitled to substantial deference. *See Solomon v. Aetna Life Ins. Co.*, 782 F.2d 58, 61 (6th Cir. 1986). The court met its responsibility to consider the pertinent factors and did not abuse its discretion in finding no just reason for delay of an appeal. *See Planned Parenthood Sw. Ohio Region*, 696 F.3d at 500.

Because the Rule 54(b) certification was proper, we have jurisdiction over the three claims to which it pertains.  As it turned out, the Rule 54(b) partial judgment and the final judgment bring before us all four counts for review in one consolidated appeal. We turn to the merits of each claim.

## III.  STANDARDS OF REVIEW

We review *de novo* a district court order granting a Rule 12(b)(6) motion to dismiss.  *Dudenhoefer v. Fifth Third Bancorp*, 692 F.3d 410, 416 (6th Cir. 2012).  In evaluating the complaint for failure to state a claim, we must construe the allegations of the complaint in the light most favorable to plaintiffs, accept all well-pled factual allegations as true, and decide whether the complaint contains sufficient facts to state a claim for relief that is plausible on its face.  *Id.* Similarly, we review the grant of summary judgment *de novo.  Tingle v. Arbors at Hilliard*, 692 F.3d 523, 529 (6th Cir. 2012).  Summary judgment is appropriate if there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law.  *Id.*

## IV.  MERITS

### A. Commerce Clause

In *National Federation of Independent Business v. Sebelius*, 132 S. Ct. 2566, 2593, 2644–2650 (2012), the Supreme Court considered a challenge to the individual mandate under the Commerce Clause, but ultimately held that Congress properly exercised its taxing power to require individuals to purchase health insurance or pay a tax—the shared responsibility payment. *Id.* at 2593–98.  Because the Court has already passed upon the constitutionality of the individual mandate and has affirmed its validity, the district court did not err in granting summary judgment in favor of defendants on this count.[3]

---

[3]Pending before us in No. 11-3798 is a motion filed by plaintiffs, prior to the issuance of *National Federation of Independent Business*, requesting that we enter judgment on the first count by adopting *Thomas More Law Ctr. v. Obama*, 651 F.3d 529 (6th Cir. 2011), *abrogated by Nat'l Fed'n of Indep. Bus. v. Sebelius*, 132 S. Ct. 2566 (2012). Although plaintiffs disagreed with the reasoning and result of *Thomas More Law Ctr.*, plaintiffs acknowledged that it stated the law of the circuit at the time the motion was made.  Plaintiffs' motion is denied in light of *National Federation of Independent Business*.

**B. Freedom of expressive and intimate association**

Plaintiffs alleged that PPACA infringes on USCA members' freedom of intimate and expressive association as guaranteed by the First and Fifth Amendments. Plaintiffs allege that PPACA violates their freedom of intimate association because it interferes with their doctor–patient relationships. They claim to possess a fundamental privacy right to select doctors of their own choosing who use methods and approaches they approve. Further, they argue, they have a right not to associate with doctors who prescribe, and insurers that pay for, methods and approaches plaintiffs reject. They contend that they should not have to pay twice—once for insured care they do not want and again for the holistic and alternative care they prefer.

With regard to freedom of expressive association, the plaintiffs assert that PPACA requires USCA members to obtain health insurance and subscribe to plans "qualified" by the federal government whether or not they agree with the standards of care or the kinds of medical services that the PPACA prescribes as "qualified" for coverage. Plaintiffs claim to enjoy a fundamental First Amendment right to be free of any forced association with private health insurers through government-compelled membership in a particular "qualified" private plan. They argue that this compulsory requirement of PPACA substantially burdens their expressive conduct because it interferes with their right to criticize or boycott medical care funded by third-party insurance companies. We examine each of these theories in turn.

*1. Freedom of intimate association*

Decisions to enter into and maintain certain intimate human relationships "must be secured against undue intrusion by the State because of the role of such relationships in safeguarding the individual freedom that is central to our constitutional scheme. In this respect, freedom of association receives protection as a fundamental element of personal liberty." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 617–18 (1984). The types of personal relationships that qualify for constitutional protection "attend the creation and sustenance of a family" including marriage, childbirth, raising and educating children, and cohabitation with relatives. *Id.* at 619; *Johnson v. City of Cincinnati*, 310 F.3d 484,

499 (6th Cir. 2002). In addition, courts have extended protection to personal friendships and non-marital romantic relationships. *Anderson v. City of LaVergne*, 371 F.3d 879, 882 (6th Cir. 2004). These kinds of personal relationships are characterized by "such attributes as relative smallness, a high degree of selectivity in decisions to begin and maintain the affiliation, and seclusion from others in critical aspects of the relationship." *Roberts*, 468 U.S. at 620. Only similar relationships "with these sorts of qualities are likely to reflect the considerations that have led to an understanding of freedom of association as an intrinsic element of personal liberty." *Id.* On the other hand, an association with a large business enterprise lacks these qualities necessary for constitutional protection. *Id.* And in between these two points "lies a broad range of human relationships that may make greater or lesser claims to constitutional protection from particular incursions by the State." *Id.* To evaluate whether constitutional protection extends to a particular association, the relationship's objective characteristics must be assessed to determine where the relationship lies "on the spectrum from the most intimate to the most attenuated of personal attachments." *Id.* Factors relevant to this analysis include "size, purpose, policies, selectivity, and congeniality." *Id.*

We have described the right to intimate association as protecting "those relationships . . . that presuppose deep attachments and commitments to the necessarily few other individuals with whom one shares not only a special community of thoughts, experiences, and beliefs but also distinctly personal aspects of one's life." *Anderson*, 371 F.3d at 881–82 (internal quotation marks omitted). We have also recognized that medical patients typically do not share "deep attachments and commitments" with physicians, nor do patients and physicians typically share "a special community of thoughts, experiences, and beliefs." *See id.*

Plaintiffs contend that their relationships with their physicians satisfy certain aspects of intimate association: relative smallness (a relationship between two individuals), a high degree of selectivity (the choice of a doctor is significant and selective), and seclusion from others in critical aspects (doctor-patient confidentiality protects the disclosure of private health information). Citing *Andrews v. Ballard*,

498 F. Supp. 1038, 1047 (S.D. Tex. 1980), plaintiffs suggest that the right to intimate association extends to their doctor–patient relationships. In *Andrews*, the district court addressed a claim that a patient's decision to obtain acupuncture treatment is a constitutional right encompassed within the right of privacy, and that Texas regulations limiting the practice of acupuncture to licensed physicians imposed a significant burden on the patient's decision and were not narrowly drawn to achieve a compelling state interest. *Id.*

*Andrews* is inapposite. There the court was concerned with an alleged Fourteenth Amendment right to privacy, not the First Amendment right to intimate association. *Id.* at 1045. The case is also distinguishable because the statute at issue imposed a direct limitation on the ability of physicians to practice, whereas the individual mandate does not impose any similar limitations on the rights of physicians. At most, *Andrews* is authority from a lower court in another circuit that may be persuasive. It does not compel us to hold that plaintiffs' doctor–patient relationships are protected by the freedom of intimate association.

Even if the factors of smallness, selectivity, and seclusion of others exist to some degree in plaintiffs' relationships with their doctors, those factors are not sufficient to establish a right to intimate association that should receive heightened scrutiny. *See Flaskamp v. Dearborn Pub. Sch.*, 385 F.3d 935, 942 (6th Cir. 2004). The Ninth Circuit has concluded that the relationship between a psychoanalyst and a patient was not the type of bond that qualified for intimate association, *see e.g. Nat'l Ass'n for Advancement of Psychoanalysis v. Cal. Bd. of Psychology*, 228 F.3d 1043, 1050 (9th Cir. 2000), because these kinds of ties have not "played a critical role in the culture and traditions of the Nation by cultivating and transmitting shared ideals and beliefs," nor have they acted "as critical buffers between the individual and the power of the State." *Roberts*, 468 U.S. at 618–19. Moreover, "most federal courts have held that a patient does not have a constitutional right to obtain a particular type of treatment or to obtain treatment from a particular provider if the government has reasonably prohibited that type of treatment or provider." *Mitchell v. Clayton*, 995 F.3d 772, 775 (7th Cir. 1993) (citing

cases); *Carnohan v. United States*, 616 F.2d 1120, 1122 (6th Cir. 1980) ("Constitutional rights of privacy and personal liberty do not give individuals the right to obtain laetrile free of the lawful exercise of governmental police power."). In addition, relationships with large business enterprises like health insurance companies do not qualify as intimate associations warranting constitutional protection. *Roberts*, 468 U.S. at 620.

We conclude that the individual plaintiffs, Thompson and Grapek, failed to show that they possess a right of intimate association with physicians that is infringed by the individual mandate. USCA's claim also fails as it does not explain how its size, purpose, policies, selectivity, and congeniality establish that it has a protected right to intimate association. *See id.* at 620–21 (holding that Jaycees chapters lack the distinctive characteristics that might afford constitutional protection).

Plaintiffs' claim that PPACA violates their freedom of intimate association fails for another reason. Nothing in the individual mandate precludes plaintiffs from establishing relationships with the medical professionals of their choice, nor does the individual mandate require them to associate with particular medical professionals. The individual mandate simply requires most Americans to maintain a minimum level of health insurance coverage or make the shared responsibility payment. *Nat'l Fed'n of Indep. Bus.*, 132 S. Ct. at 2580, 2595–96. The district court properly dismissed this claim.

### 2. *Freedom of expressive association*

The right of expressive association is the First Amendment right to associate for the purpose of speaking. *Rumsfeld v. Forum for Academic and Inst. Rights, Inc.*, 547 U.S. 47, 68 (2006); *Miller v. City of Cincinnati*, 622 F.3d 524, 537 (6th Cir. 2010). The right protects a group's membership decisions and shields against laws that make group membership less attractive without directly interfering in an organization's composition. *Miller*, 622 F.3d at 537. The freedom to speak "could not be vigorously protected from interference by the State unless a correlative freedom to engage in group effort toward those ends were not also guaranteed." *Roberts*, 468 U.S. at 622. "Freedom of association . . . plainly presupposes a freedom not to associate." *Id.* at 623. But the

"right to associate for expressive purposes is not . . . absolute." *Id.* Infringements on the right "may be justified by regulations adopted to serve compelling state interests, unrelated to suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms." *Id.*

To evaluate an expressive association claim, the court uses a three-step process. *Miller*, 622 F.3d at 538. The first element asks whether a group is entitled to protection; the second asks whether the government action in question significantly burdens the group's expression (affording deference to the group's view of what would impair its expression); and the third requires weighing the government's interest in the restriction against plaintiff's right of expressive association. *Id.* While USCA appears to be a group entitled to protection, plaintiffs do not satisfy step two.

Plaintiffs have failed to show how the individual mandate significantly burdens the group's expression. The individual mandate does not impair plaintiffs' ability to engage in expressive conduct—they are free to voice their disapproval of PPACA or health insurance in general, and "nothing about the statute affects the composition of the group by making group membership less desirable." *See Rumsfeld*, 547 U.S. at 69–70. Nor does PPACA force USCA to admit insurance companies as members. *See Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648 (2000); *Roberts*, 468 U.S. at 623. Plaintiffs are not required to obtain health insurance and associate with health insurers at all; they may choose to pay the shared responsibility payment instead. *See Nat'l Fed'n of Indep. Bus.*, 132 S. Ct. at 2597 ("[I]f someone chooses to pay rather than obtain health insurance, they have fully complied with the law"). While Congress passed PPACA "to increase the number of Americans covered by health insurance and decrease the cost of health care," *id.* at 2580, failure to obtain health insurance does not, as alleged, turn Thompson and Grapek into outlaws. Rather, payment of "the shared responsibility payment merely imposes a tax citizens may lawfully choose to pay in lieu of buying health insurance." *Id.* Because plaintiffs' right of expressive association is not impaired by the individual mandate, this claim is without merit and the district court properly dismissed it.

**C.  Right to liberty**

Plaintiffs next allege that PPACA violates certain fundamental rights encompassed within the term "liberty" in the Due Process Clause of the Fifth Amendment.  They alleged the following rights:  to be let alone, including the right to make choices not to receive medical treatment of a particular kind or at all; not to pay for unwanted treatments or pay for insurance that covers unwanted treatments; and not to divulge medical confidences to a private insurer or its agents in order to obtain health insurance.

Plaintiffs aver that competent adults possess a fundamental right to refuse unwanted medical care, *see Cruzan v. Director, Mo. Dep't of Health*, 497 U.S. 261, 278 (1990), as well as a fundamental right to medical autonomy, *see Planned Parenthood v. Casey*, 505 U.S. 833 (1992).  They argue that the constitutionally protected liberty right to reject unwanted medical care encompasses their decision not to pay for unwanted medical care. The individual mandate places a coercive burden on the exercise of the right to refuse unwanted medical care, plaintiffs contend, because they must either (1) pay for unwanted health insurance that covers unwanted medical services, or (2) pay the tax.  They claim that the financial penalty burdens the exercise of a fundamental right and is therefore coercive and presumptively unconstitutional.

The individual mandate does not implicate the fundamental liberty right of Thompson or Grapek to refuse unwanted medical care.  As we previously stated, the individual mandate requires either the purchase of health insurance or the payment of a shared responsibility payment.  *See Nat'l Fed'n of Indep. Bus.*, 132 S. Ct. at 2597. Plaintiffs remain free to choose their medical providers and the medical treatments they will or will not accept.

Further, "no court has invalidated these kinds of mandates under the Due Process Clause or any other liberty-based guarantee of the Constitution."  *Thomas More Law Ctr.*, 651 F.3d at 565 (Sutton, J., concurring in part), *abrogated on other grounds in Nat'l Fed'n of Indep. Bus. v. Sebelius*, 132 S. Ct. 2566.  The Supreme Court long ago abandoned the protection of economic rights through substantive due process.

*See Ferguson v. Skrupa*, 372 U.S. 726, 730 (1963) ("The doctrine that prevailed in *Lochner* . . .–that due process authorizes courts to hold laws unconstitutional when they believe the legislature has acted unwisely–has long since been discarded.")  An alleged fundamental right must be carefully formulated, and it must be "objectively, deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." *Washington v. Glucksberg*, 521 U.S. 702, 720–22 (1997).

Regardless of whether plaintiffs' claim is cast as a freedom to remain uninsured or a freedom to refuse to pay for unwanted medical care, the right asserted cannot be characterized as "fundamental" so as to receive heightened protection under the Due Process Clause.  *See Fla. ex rel. Atty. Gen. v. U.S. Dep't of Health and Human Servs.*, 648 F.3d 1235, 1362–63 (11th Cir. 2011) (Marcus, J., concurring in part and dissenting in part), *aff'd in part and rev'd in part on other grounds*, *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 132 S. Ct. 2566 (2012).  USCA has not attempted to make a showing, nor could it, that it possesses a fundamental liberty right to refuse unwanted medical care. Plaintiffs' right to liberty claim is also without merit, and the district court properly dismissed it.

**D.  Right to privacy**

Finally, in the last count of the Second Amended Complaint, plaintiffs alleged that they enjoy a constitutionally protected interest in the confidentiality of their medical information.  They claimed that the federal government cannot constitutionally compel disclosure of USCA members' private medical information to a private insurer because the government's interest in disclosure fails to outweigh plaintiffs' constitutionally protected interest in privacy.  They also alleged that PPACA compels them to enter contracts against their will and forces them to disclose confidential medical information to insurance companies and, by virtue of the government's right of access to that information, to the government itself.  Plaintiffs alleged that this right arises from the First, Third, Fourth, Fifth and Ninth Amendments.

Substantive due process protects an individual's interest in avoiding the disclosure of personal matters, such as private health information. *Whalen v. Roe*, 429 U.S. 589, 599 (1977); *Bailey v. City of Port Huron*, 507 F.3d 364, 367 (6th Cir. 2007). But not all statutes that require the disclosure of personal information are unconstitutional. In *Whalen*, the Supreme Court rejected a constitutional challenge to a state statute that required physicians and pharmacists to use a triplicate form to document each prescription written and filled for Schedule II drugs and then to supply a copy of each form to the State. *Id.* at 593. Upon receipt of the forms, state employees entered the data into computers for the purpose of investigating any cases of over-dispensing of the drugs. *Id.* at 594–95. The statute expressly prohibited public disclosure of patient identities, but this did not allay the patients' fears that their private health information would be disclosed and they would be stigmatized as "drug addicts." *Id.* at 595.

The Supreme Court upheld the constitutionality of the statute as "the product of an orderly and rational legislative decision" to exercise the State's broad police power. *Id.* at 597–98. The Court characterized the possibility of unwarranted disclosure of patient information as "remote" and insufficient to invalidate the entire program. *Id.* at 601–02. Importantly, the Court stated that public disclosures of private health information are not

> meaningfully distinguishable from a host of other unpleasant invasions of privacy that are associated with many facets of health care. Unquestionably, some individuals' concern for their own privacy may lead them to avoid or to postpone needed medical attention. Nevertheless, disclosures of private medical information to doctors, to hospital personnel, to insurance companies, and to public health agencies are often an essential part of modern medical practice even when the disclosure may reflect unfavorably on the character of the patient. Requiring such disclosures to representatives of the State having responsibility for the health of the community, does not automatically amount to an impermissible invasion of privacy.

*Id.* at 602 (footnote omitted).

The individual mandate does not actually compel plaintiffs to disclose personal medical information to insurance companies. But even if it did, the Supreme Court's reasoning in *Whalen* dispenses with plaintiffs' position that the individual mandate is unconstitutional because it may require the disclosure of private health information to insurance companies. Plaintiffs can avoid any privacy concern altogether by simply foregoing insurance and complying with the individual mandate by making the shared responsibility payment. *See Nat'l Fed'n of Indep. Bus.*, 132 S. Ct. at 2597. Finally, any injury plaintiffs may suffer by disclosing their private health information to insurance companies is highly speculative at this point, *see Wilson v. Collins*, 517 F.3d 421, 430 (6th Cir. 2008), and plaintiffs did not allege any specific facts to support such injury. Plaintiffs' right to privacy claim is without merit and was properly dismissed.

## V.  CONCLUSION

As a result of the proper entry of a partial judgment under Rule 54(b), we have jurisdiction to consider the merits of the constitutional claims raised in Counts Two through Four, along with the merits of the Commerce Clause challenge that comes to us by way of final judgment. The Supreme Court's opinion in *National Federation of Independent Business v. Sebelius* controls the outcome on Count One, and the remaining constitutional claims were correctly dismissed for failure to state a claim. Accordingly, we affirm the grant of summary judgment in favor of defendants on Count One and we affirm the Rule 12(b)(6) dismissal on the remaining claims.